# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MUMIN ISRAFIL,
    Plaintiff

    vs

BARBARA WOODS, et al.,
    Defendants

Case No. 1:09-cv-468

Spiegel, J.
Hogan, M.J.

**REPORT AND RECOMMENDATION
AND ORDER**

Plaintiff, an inmate at the Warren Correctional Institution (WCI) in Lebanon, Ohio,

brings this action pursuant to 42 U.S.C. § 1983 against Barbara Woods, Dr. James Coulter,

Captain Sexton, Wanza Jackson, and John Does 1-4. (Doc. 42). Plaintiff alleges a claim of

deliberate indifference to serious medical needs in violation of the Eighth Amendment to the

United States Constitution.

This matter is before the Court on plaintiff's motion for a temporary restraining

order/preliminary injunction (Doc. 43) and defendants' memorandum in opposition thereto.

(Doc. 68). Plaintiff's motion seeks a Court order "enjoining Defendant Coulter from continuing

to deny Mr. Israfil constitutionally required medical care" and to "provide Mr. Israfil with a

wheel chair so that he can attend medical appointments necessary for further diagnosis and

treatment." (Doc. 43 at 8).

On September 7, 2010, the undersigned Magistrate Judge held a video-teleconference

hearing on plaintiff's motion for temporary restraining order/preliminary injunction at which

plaintiff Mumin Israfil and counsel for defendant were present. For the reasons that follow, the

Court recommends that plaintiff's motion be denied.

## I. BACKGROUND

Plaintiff initially filed this action pro se against WCI Chief Medical Officer Barbara Woods alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment. (Doc. 1). Plaintiff's original complaint alleged that as a result of injuries he suffered after being struck from behind by a golf cart being driven by a WCI employee, he suffers from a back condition which causes him severe pain and renders him unable to walk. His original complaint alleged that defendant Woods denied his requests for a walking cane, bottom bunk restriction, and stronger pain medications to treat his injuries. He also alleged that defendant Woods refused to administer pain medication in the dosage and with the frequency previously prescribed by specialists at the Ohio State University Hospital and the Corrections Medical Center after he was diagnosed with herniated lumbar discs. *Id*.

In view of the serious nature of plaintiff's allegations, the Court requested the assistance of the attorneys from the Ohio Justice and Policy Center to represent plaintiff in this case. (Doc. 32). Counsel agreed to the appointment and filed an amended complaint and motion for temporary restraining order/preliminary injunction on plaintiff's behalf. (Docs. 42, 43).

A hearing on the motion was scheduled for June 28, 2010. In the meantime, counsel for plaintiff and defendants attempted to resolve the medical issues raised by the motion for temporary restraining order/preliminary injunction without Court intervention. This included an agreement to have plaintiff undergo an independent medical examination by Dr. Carole Miller, M.D., a neurosurgeon at the Ohio State University Medical Center, to determine the status of plaintiff's medical condition and recommendations for treatment. The undersigned traveled to the Warren Correctional Institution on June 10, 2010 to have a face-to-face meeting with Mr.

2

Israfil and help facilitate communication between Mr. Israfil, all counsel, and the Court in an effort to reach a speedy resolution of the medical issues raised by plaintiff's motion.

Thereafter, the parties agreed to stay the hearing on the motion pending the independent medical examination by Dr. Miller. (Doc. 57). The parties were ordered to advise the Court whether a hearing on the motion would be necessary following the examination by Dr. Miller. *Id.*

On July 29, 2010, Mr. Israfil underwent an examination by Dr. Miller at the Outpatient Clinic at the Ohio State University Hospital.

On August 18, 2010, Mr. Israfil filed a pro se motion for removal of his appointed attorneys based on fundamental disagreements about the course of representation in his case. He also moved for the appointment of successor counsel. (Doc. 63). Following a telephone conference with the Court at which pro se plaintiff Mumin Israfil, his counsel, and counsel for defendants were present, the Court granted Mr. Israfil's motion for removal of appointed attorney. (Doc. 66). However, the Court denied Mr. Israfil's request for successor counsel because it was apparent to the undersigned from Mr. Israfil's court filings and letters, as well as the Court's face-to-face meeting with Mr. Israfil, that he believes his approach to this litigation is the best one and that appointment of successor counsel would be futile. *Id.*

During that same telephone conference and by Order dated August 31, 2010, the Court advised the parties that a hearing on plaintiff's motion for temporary restraining order/ preliminary injunction (Doc. 43) was scheduled for Tuesday, September 7, 2010. The Court explained to Mr. Israfil that because his motion for temporary restraining order/preliminary injunction had been pending since March 25, 2010, it was incumbent upon the undersigned to issue a recommendation on such motion to the district court judge without further delay. The

3

Court advised Mr. Israfil that if he wished to postpone a hearing on his motion until after the discovery deadline of September 30, 2010, he should file a motion to withdraw his previously filed motion for temporary restraining order/preliminary injunction. Mr. Israfil was further advised that if he withdrew his motion for temporary restraining order/preliminary injunction, he could refile it after the discovery deadline. (Doc. 66). Mr. Israfil did not withdraw his motion and a hearing was held as scheduled.

After this matter was heard by the Court on the morning of September 7, 2010, plaintiff filed a "motion for continuance" seeking to postpone the hearing "without withdrawing his motion for TRO/preliminary injunction relief" and stating he needed more time to obtain papers from his former attorney and to obtain discovery. (Doc. 69). Mr. Israfil also filed several other documents which will be discussed below.

## II. PLAINTIFF'S EVIDENCE AND POSITION

In support of his request for a temporary restraining order and/or preliminary injunction, plaintiff Israfil presents his own declaration dated March 25, 2010 which states the following facts: On August 6, 2008, Mr. Israfil was struck by a golf cart driven by WCI employees. (Doc. 43, Exhibit 1, Israfil Declaration at ¶3). He was struck in the back of the leg and fell to the ground, injuring his right arm, right leg, back and neck. *Id*. at ¶3.

From the date of the accident through May, 2009, Mr. Israfil repeatedly made institutional medical staff, including defendant Woods, aware of his injuries and pain through medical visits and the inmate grievance procedure. *Id.* at ¶4. At different times during that time period, he was prescribed Motrin, Tylenol, Prilosec, Zantac, and a muscle relaxant. *Id.* The medications did not relieve his pain. *Id.* He requested a cane, a bottom bunk restriction, a bottom range housing

4

restriction, and more active pain management. Each request was denied. *Id.*

On May 15, 2009, Mr. Israfil was handcuffed then knocked to the ground by a corrections officer. *Id.* at ¶5. He was then carried by his limbs to disciplinary segregation. *Id.* In the course of this transport, Mr. Israfil was repeatedly dragged, twisted, and yanked in different directions, exacerbating the pain he had been experiencing since August 2008. *Id.* Mr. Israfil states that after this incident, the pain in his back and neck made walking very difficult. *Id.*

On June 12, 2009, Mr. Israfil was scheduled for an appointment with a neurologist at the Corrections Medical Center ("CMC"). *Id.* at ¶6. Given his inability to walk, Mr. Israfil requested a wheelchair to access the transport bus. The officer told him that he would walk or not go at all. *Id.* Several more corrections officers arrived to Mr. Israfil's cell. *Id.* The officers proceeded to handcuff Mr. Israfil behind his back and carried him to the van by his handcuffs and the seat of his jumpsuit. *Id.*

After a brief evaluation, the CMC neurologist ordered that Mr. Israfil be taken directly to an emergency room at OSUMC, where OSUMC doctors determined that Mr. Israfil had two herniated disks in his spine. Mr. Israfil was given pain medication intravenously. *Id.* at ¶10.

Upon returning to WCI on June 17, 2009, and with the help of the medication given to Mr. Israfil at CMC, he was able to walk with some discomfort. The following day his medication dosage was reduced, and by late June or early July of 2009, he was taken off all pain medication and could barely walk. *Id.* at ¶¶12-14.

On July 21, 2009, defendant Coulter, who by then was the medical director at WCI, conducted an examination of Mr. Israfil during which he pushed his knuckles forcefully into Mr. Israfil's spine, causing him extreme pain and to urinate on himself. *Id.* at ¶15. Since the incident,

Mr. Israfil has constant urination and bowel movement sensations and an increase in incontinence episodes. *Id.*

In July, 2009, Mr. Israfil attended a neurosurgery teleconference. *Id.* at ¶16. In the midst of the examination, the neurosurgeon ordered that Mr. Israfil be taken directly to OSU Emergency Room. At the Emergency Room, he received pain medication and steroid injections. *Id.*

When he returned to WCI, Mr. Israfil's pain medication was replaced by anti-inflammatory pills. *Id.* at ¶17. He complained to staff that these were ineffective. *Id.*

In August, 2009, Mr. Israfil was transferred to CMC, where he was placed on Ultram. *Id.* at ¶21. When he returned to WCI, defendant Coulter placed Mr. Israfil on Darvocet instead of continuing with Ultram. Mr. Israfil complained to the medical staff that the medication was not providing relief and caused significant side effects, including sore throat, ringing ears, upset stomach, and fluorescent green feces. *Id.* For these reasons, Mr. Israfil chose to stop taking the Darvocet. *Id.*

On September 21, 2009, upon release from medical segregation to the general population, Mr. Israfil was pushed by wheelchair half the distance to his housing pod and was ordered to walk the rest. *Id.* at ¶22. Since Mr. Israfil is unable to walk, the corrections officer charged him with disobedience of a direct order and wheeled him back into disciplinary segregation, where he has remained since. *Id.* at ¶22.

Mr. Israfil states that he has had an appointment set with a nutritionist, the CMC pain clinic, and a physician regarding incontinence in September and October of 2009. He requested wheelchair transportation for each appointment, but was denied. He states he could not access

6

the medical appointments. *Id.* at ¶23.

Mr. Israfil states he has been diagnosed by OSUMC as having severe degenerative bone disease in his entire spine, scoliosis in his lower spine, and two herniated disks in his lower spine. *Id.* at¶¶8-9.  He also suffers from chronic incontinence, uncontrollable bowel movements *Id.* at ¶15, chronic headaches, spasms and periodical paralysis of his hands, legs and feet, and persistent pain in his shoulders, neck, back, and hips. *Id.* at ¶25.

Mr. Israfil states his ability to walk is limited to shuffling several inches at a time in substantial pain. *Id.* at ¶24.  He states he cannot walk to the dining hall for meals or retrieve his medication from the medical facility and, as a result, has not received any treatment or attention for his back in months. *Id.*  Daily activities such as grooming, urinating, and coughing are all extremely painful. *Id.* at ¶24.  He state he has not showered in many months because it is nearly impossible to walk to the showers and the shower has no seat, which would allow him to sit and bathe himself. *Id.*

Mr. Israfil states he has been in segregation since September 2009 because his inability to walk has been interpreted by the staff as a disciplinary issue. *Id.* at ¶27.

At the hearing of this matter on September 7, 2010, Mr. Israfil testified that he believes his condition puts him at risk of injury in the event of a fire because of his lack of mobility; that he needs a shower seat and scrub brush for bathing, which has been denied; that he needs an elevated toilet seat to help him from falling; and needs a bar in the toilet stall to help raise and lower himself.  Although the Court observed Mr. Israfil to be seated in a wheelchair at the hearing, he testified he has not been provided a wheelchair on a regular basis.

Mr. Israfil argued that the expert report of Dr. Miller was not in compliance with the

Federal Rules; that disclosures in this case were not made by defendants in accordance with Rule

26; and that the Court lacks jurisdiction over the defendants for purposes of this hearing.  Later

on in the hearing, Mr. Israfil reversed his position and stated the Court in fact has jurisdiction to

rule on his motion.

      Mr. Israfil did not present any medical evidence at the hearing.

      Subsequent to the hearing, Mr. Israfil submitted a document entitled "Notice of Discovery

Documents and Witnesses to Support Clarified Claim for TRO/Preliminary Injunction Relief"

(Doc. 71) in support of his request for injunctive relief.  In his "Notice" plaintiff now states he is

not seeking "injunctive relief for any defendant to provide him with a wheelchair." *Id.*  Plaintiff

states that Dr. Miller diagnosed "chronic pain syndrome" and that he seeks injunctive relief "to

prohibit defendant Coulter from withholding medically necessary treatment from plaintiff." (Doc.

71 at 1).  Plaintiff states that "treatment was always either rejected or discontinued by defendant

Coulter without cause." (Doc. 71 at 2).  Plaintiff alleges that Drs. Khan, Conley, and Akusoba,

physicians from the CMC and Ohio State University Hospital, will testify about their treatment

of plaintiff. (Doc. 71 at 3).  Plaintiff alleges, "Dr. Coulter will testify that he rejected Dr. Hannah

[Conley]'s pain management instructions; he later continued Dr. Akusoba's pain management

instructions; later altered Dr. Akusoba's treatment; further altered treatment; finally discontinued

treatment." (Doc. 71 at 3).  Plaintiff attaches a report from Dr. Khan of the Ohio State University

Medical Center dated June 12, 2009, showing a diagnosis of low back pain and neck pain, the

results of MRI testing, and instructions for Percocet for pain. (Doc. 71, attachment).  He also

submits a letter from Dr. Miller to Dr. Akusoba dated July 20, 2009, advising that plaintiff was

seen in the Neurosurgery Telemedicine Clinic and needed a hands-on examination to be

evaluated. *Id.* That same day, plaintiff was seen at the Ohio State University Medical Center and prescribed Acetaminophen-Oxycodone Hydrochloride, Ketoralac Tromethamine, Oxycodone, and Prednisone by Dr. Conley. *Id.*

Plaintiff has also submitted a document entitled "Objection to Expert Testimony of Carole A. Miller, M.D." (Doc. 72). Plaintiff asserts he objects to the Court's consideration of Dr. Miller's report "for the failure to disclose a report meeting the requirements of Fed. Civ. R. 26(a)(2)(B)." *Id.*

Mr. Israfil has also filed his a motion for physical and psychological evaluation, and for the court appointment of an expert other than Dr. Miller. (Doc. 67).

Subsequent to the hearing, the Court also received plaintiff's "motion for subpoena court assistance," which seeks the Court's assistance in issuing subpoenas duces tecum for the four doctor witnesses listed in plaintiff's "Notice." (Doc. 74).

## III. DEFENDANTS' EVIDENCE AND POSITION

Defendants present the declaration of Amy Whitaker, R.N., the WCI Health Care Administrator, who oversees the operations of the WCI infirmary, is custodian of inmate medical records, and who interfaces with physicians, nurses, inmates, staff, and medical departments of the Ohio Department of Rehabilitation and Correction. (Doc. 68, Exh. A, ¶2). Ms. Whitaker states she has examined Mr. Israfil's recent medical records. *Id.* at ¶9. His medical records show he refused chronic care visits to the medical department on March 17, 2010 and May 19, 2010. *Id.* at ¶9. On April 7, 2010, Mr. Israfil was transported to the medical department via wheelchair. However, he refused an examination by Dr. Coulter and refused to sign an "Against Medical Advice" form. On July 15, 2010, Mr. Israfil refused to see the nurse practitioner. On August 3,

9

2010, he refused an MRI test which had been ordered. *Id.*

Ms. Whitaker states that Dr. Coulter is the medical director of WCI who makes all medical treatment decisions concerning WCI inmates. *Id.* at ¶8. Ms. Whitaker states that at the present time, no person other than Dr. Coulter is authorized to prescribe medication (with the exception of mental health medication ordered by WCI's psychiatrists) or to order wheelchairs or other tests or evaluations for inmates. *Id.* Ms. Whitaker states that inmates do not have the authority to pick and choose the physician of their choice or to prescribe drugs or treatment for themselves. *Id.*

Ms. Whitaker also states she obtained the Independent Medical Evaluation of Mr. Israfil by Carole A. Miller, M.D., on July 29, 2010. *Id.* at 7. Attached to Ms. Whitaker's declaration is Dr. Miller's report.

Dr. Miller's July 29, 2010 report indicates she reviewed previous medical records for Mr. Israfil. These included a June 2009 lumbar MRI scan which showed mild to moderate disc degeneration and disc bulge at L4-5, and an April 2009 cervical MRI scan which showed multilevel cervical degenerative disc disease with foraminal narrowing. (Doc. 68, Exh. A-1). Dr. Miller also reviewed Mr. Israfil's history and performed a physical examination of Mr. Israfil. Dr. Miller stated that previous testing indicates Mr. Israfil has moderate cervical spondylosis and underlying cervical and lumbar degenerative disc disease. Dr. Miller opined that "[t]hese conditions can lead to and cause chronic pain." *Id.* Because Dr. Miller did not have a follow-up cervical MRI scan or EMGs following the additional injuries plaintiff alleged to have occurred in 2009, she could not "absolutely rule out the possibility of a cervical myelopathy as causing the current weakness in his legs." *Id.* Dr. Miller stated:

> I cannot state with reasonable medical certainty at this time whether or not [Mr. Israfil] has a significant neurologic abnormality which may be producing the inability to walk and the complaints that he has. I suspect there may be a significant functional aspect to this.

(Doc. 68, Exh. A-1 at 6). Dr. Miller further stated:

> I also believe that based on my evaluation, there may be a psychiatric component here and that this may be a type of hysterical conversion reaction or malingering. However, based on the information I have at the present time, I cannot state that to a reasonable degree of medical probability. I am unable, without further testing able to state, whether he does or does not have an anatomic or objective substrate to account for his inability to walk. I suspect he does not but do not have sufficient information at the present time.

*Id.*

Dr. Miller recommended the following additional testing and evaluation which may aid in further assessing Mr. Israfil's condition and determining what, if any, course of treatment is called for:

> 1. A cervical MRI scan with and without contrast.
>
> 2. A lower extremity EMG and nerve conduction velocities.
>
> 3. An upper extremity EMG and nerve conduction velocities.
>
> 4. Neuropsychiatric testing and that Mr. Israfil be seen by a neuropsychologist and psychiatrist.

*Id.* Dr. Miller stated that if these tests "do not show he has myelopathy or nerve damage, it would be my opinion that more likely than not much of what we are seeing here is functional. However, based on the information we have, there is sufficient evidence to support a chronic pain syndrome, both in the cervical and lumbar areas as a result of cervical and lumbar degenerative disk disease." *Id.*

Defendants contend that there is no medical evidence supporting plaintiff's claim that he

cannot walk or has any need for medical intervention.  Nevertheless, defendants represented to the Court at the status conference held on August 31, 2010 and at the September 7, 2010 hearing of this matter that in the interest of resolving this litigation, the Ohio Department of Rehabilitation agreed to facilitate and pay for Dr. Miller's independent medical examination of plaintiff.  Moreover, defendants state they are prepared to work with Dr. Miller in facilitating the three physical examinations she proposed (the MRI and both upper and lower EMGs), and upon receipt of those test results, defendants would consider ordering the psychological evaluations.

At the status conference on August 31, 2010, counsel for defendants proposed the plan of working with Dr. Miller to obtain the recommended MRI and EMGs.  However, Mr. Israfil declined to participate in such evaluations.

Counsel for defendants represents that on September 1, 2010, in a conversation with Mr. Israfil, he once more declined to undergo the tests recommended by Dr. Miller. (Doc. 75).

## IV.  PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING  ORDER/ PRELIMINARY INJUNCTION SHOULD BE DENIED.

In determining whether to issue a temporary restraining order and/or preliminary injunction in this matter, the Court balances the following factors:

1.  Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

2.  Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

3.  Whether an injunction will cause others to suffer substantial harm; and

4.  Whether the public interest would be served by a preliminary injunction.

12

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 347 (6th Cir. 1998); *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 n.3 (6th Cir. 1991).  The four factors are not prerequisites, but must be balanced as part of a decision to grant or deny injunctive relief. *Leary,* 228 F.3d at 736; *Performance Unlimited v. Quester Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).

A preliminary injunction is an extraordinary remedy that should only be granted if the movant carries his burden of proving that the circumstances clearly demand it. *Leary*, 228 F.3d at 739.  Plaintiff must establish his right to a preliminary injunction by clear and convincing evidence. *Quinn v. Ohio State Highway Patrol*, No. 2:07-cv-187, 2007 WL 4190849, at *1 (S.D. Ohio Nov. 21, 2007) (citing *Garlock, Inc. v. United Seal, Inc.,* 404 F.2d 256, 257 (6th Cir. 1968); *Deck v. City of Toledo*, 29 F. Supp.2d 431, 433 (N.D. Ohio 1998)).

The Court finds that plaintiff has not presented evidence sufficient to warrant a temporary restraining order or preliminary injunction in this matter.  Plaintiff has failed to establish that he is substantially likely to prevail on his claim that defendants have been deliberately indifferent to his medical needs.

In order to establish his claim for relief under 42 U.S.C. § 1983 for a denial of medical care, plaintiff must present evidence showing "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  *See also Spears*, 589 F.3d at 254.  An inmate who is allowed to suffer needlessly through a denial of medical care when relief is available has a cause of action under the Eighth Amendment against an individual whose deliberate indifference caused the suffering. *Id*; *Byrd v. Wilson*, 701

13

F.2d 592, 594 (6th Cir. 1983); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). Such a

claim has both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834

(1994); *Wilson v. Seizer*, 501 U.S. 294, 297-300 (1991). *See also Spears*, 589 F.3d at 254.

The objective component requires that the deprivation alleged be "sufficiently serious."

*Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 298). "[O]nly those

deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to

form the basis of an Eighth Amendment violation." *Wilson v. Seizer*, 501 U.S. 294, 298 (1991)

(citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). *See also Thompson v. County of

Medina, Ohio*, 29 F.3d 238, 242 (6th Cir. 1994).

Under the subjective component, plaintiff must establish that defendants acted with

deliberate indifference to his serious medical needs, *Estelle*, 429 U.S. at 106; *see also Farmer*,

511 U.S. at 834; *Wilson*, 501 U.S. at 302-303, which requires evidence that defendant ignored a

known risk of harm. *Farmer,* 511 U.S. at 837, 842. A prison official may be held liable for

denying an inmate humane conditions of confinement only if he knows that an inmate faces "a

substantial risk of serious harm and disregards that risk by failing to take reasonable measures to

abate it." *Farmer*, 511 U.S. at 847. Prison officials must exhibit more than lack of due care for a

prisoner's health or safety before an Eighth Amendment violation will be found. *Id.* at 835. *See

also Whitley*, 475 U.S. at 319. "[T]he official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference." *Farmer*, 511 U.S. at 837. It is not enough that the official "should" have perceived a

significant risk, but did not. *Id.* Moreover, liability will not be found where a prison official

actually knew of a substantial risk of harm to an inmate if he responded reasonably to the risk,

even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844. Applying these standards to the instant case, the Court concludes that plaintiff fails to show a likelihood of success on his Eighth Amendment deliberate indifference claim.

Plaintiff has failed to meet the objective component of his Eighth Amendment claim in this case. The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however, the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001). Unlike cases where the seriousness of the injury or illness is obvious to even a lay person, here the seriousness of plaintiff's leg weakness or back pain cannot be discerned without competent medical proof. *Blackmore*, 390 F.3d at 899.

Plaintiff has not presented the Court with clear and convincing evidence that he suffers from a serious medical condition that causes the pain and extreme limitations in walking that he currently alleges. The June and July 2009 reports from the Ohio State Medical Center do not explain Mr. Israfil's current functioning. The only current medical evidence in the record is Dr. Miller's report. Dr. Miller states that Mr. Israfil's underlying cervical and lumbar degenerative disk disease may cause chronic pain. Yet, Dr. Miller also stated that additional testing is needed to discern the cause of the extreme limitations plaintiff now alleges. While neurological examination was "suggestive" of weakness in the lower extremities, Dr. Miller could not "state with reasonable medical certainty whether Mr. Israfil has a significant neurologic abnormality

which may be producing the inability to walk and the complaints he has." (Doc. 68, Exh. A-1 at 6). Dr. Miller has recommended additional MRI and EMG testing to determine the source of plaintiff's alleged pain and limitations. However, plaintiff has refused further testing. Plaintiff cannot complain about lack of medical treatment, then refuse medical testing when it is necessary to diagnose the problem and assess the appropriate treatment modalities. *See Hawley v. Gelabert*, No. 1:06-cv-209, 2009 WL 2515685, at *4 (W.D. Mich. Aug. 14, 2009) ("The inference to be drawn from plaintiff's refusal for additional medical testing is that he did not suffer from a serious medical condition. Sick people want to provide their medical providers with as much data as necessary to diagnose and treat their condition.").

Plaintiff also objects to Dr. Miller's report and seeks the appointment of another expert to perform a physical and mental examination. (Doc. 67). Plaintiff's objection to the report of Dr. Miller is not well-taken.

The source of plaintiff's pain and limitations is disputed. Both parties agreed to the independent medical examination by Dr. Miller in an effort to resolve the medical issues in this case. Now that Dr. Miller's report suggests there may be a psychiatric component to plaintiff's problems, he objects to the report. On the other hand, plaintiff picks out the portions of Dr. Miller's report favorable to him and cites those portions in support of his claim that he suffers from "chronic pain syndrome." (Doc. 71 at 1). Plaintiff cannot pick and choose the favorable portions of Dr. Miller's report, then ask the Court to disregard the portions that do not support his position. Plaintiff has not cited and the Court cannot discern any basis to conclude that Dr. Miller's report is biased and should be disregarded.

Nor has plaintiff established the necessity for the appointment of another expert to

16

examine him, especially when the most recent physician has recommended additional testing to diagnose plaintiff's problems and he has declined such testing. Therefore, plaintiff's motion for a Rule 35 physical and mental examination and appointment of expert is denied.

The underlying source of plaintiff's pain and alleged inability to walk has not yet been medically established. The record before the Court does not show at this time clear and convincing evidence that plaintiff in fact suffers from a serious medical condition necessitating extraordinary intervention by this Court.[1]

More importantly, plaintiff fails to establish the subjective component of his Eighth Amendment claim. Completely absent from the record is evidence establishing that Dr. Coulter or any other defendant is being deliberately indifferent to plaintiff's medical needs such that he is entitled to preliminary injunctive relief. The most recent evidence presented by plaintiff of any action by Dr. Coulter to which plaintiff objects is from over one year ago in August 2009 when defendant Coulter discontinued Ultram and prescribed Darvocet for Mr. Israfil's pain. (Doc. 43, Exhibit 1, Israfil Declaration at ¶21). Mr. Israfil chose to stop taking the Darvocet because of adverse side effects. *Id.* However, plaintiff does not present any other evidence supporting his claim that Dr. Coulter thereafter refused to treat plaintiff for any condition. In fact, the only evidence in the record before the Court is that presented by defendants indicating that plaintiff refuses to see Dr. Coulter for treatment. Plaintiff's medical records show he refused chronic care

---

[1]Plaintiff has asserted inconsistent positions on his request for injunctive relief based on alleged leg weakness and an inability to walk. Initially, plaintiff alleged that he needs a wheelchair and other medical devices to assist in his activities of daily living to accommodate the leg weakness he experiences. Now, plaintiff indicates he is no longer seeking a wheelchair as part of his claim for injunctive relief. (Doc. 71 at 2). Whether or not plaintiff needs or desires the assistance of a wheelchair, plaintiff has failed to present clear and convincing medical evidence showing that he suffers from a medical condition necessitating a wheelchair or any other devices to assist in daily living activities.

17

visits to the medical department on March 17, 2010 and May 19, 2010; that he refused an examination by Dr. Coulter and refused to sign an "Against Medical Advice" form on April 17, 2010; refused to see the nurse practitioner on July 15, 2010; and refused an MRI test which had been ordered on August 3, 2010. (Doc. 68, Exh. A, ¶9).

There is no question that plaintiff disputes the medical care and treatment he received from Dr. Coulter in the past. However, any harm plaintiff may have suffered in the past does not entitle him to preliminary injunctive relief in the present in the absence of any evidence showing Dr. Coulter or any other defendant is refusing to treat him. At this stage in the proceedings, Mr. Israfil's evidence establishes nothing more than a difference of opinion between himself and Dr. Coulter as to the necessity and type of treatment he received in the past. It does not, however, constitute deliberate indifference to medical needs justifying preliminary injunctive relief. *See Estelle*, 429 U.S. at 107-108; *Westlake*, 537 F.2d at 860-861 n.5.

Plaintiff has failed to meet his burden of showing a likelihood of success on the merits of his Eighth Amendment claim. Because he fails to meet this factor of the test for issuing a preliminary injunction, the Court need not address the other three factors. *See Gonzales v. National Board of Medical Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal."); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("[W]hile, as a general matter, none of [the] four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.").

For these reasons, the Court recommends that plaintiff's motion for a temporary restraining order/preliminary injunction be denied.

18

**V.  PLAINTIFF'S MOTIONS TO CONTINUE THE HEARING ON HIS MOTION FOR TEMPORARY RESTRAINING ORDER/ PRELIMINARY INJUNCTION (DOC. 69) AND FOR "SUBPOENA COURT ASSISTANCE" (DOC. 74) ARE DENIED.**

As discussed above, plaintiff was given the opportunity to withdraw his motion for temporary restraining order/preliminary injunction with the understanding he could refile such motion after discovery had been completed.  Plaintiff chose to go forward with the hearing.  Only after the hearing was concluded did plaintiff move to continue the hearing and seek assistance with subpoenas for witnesses.  Therefore, the motions are denied as moot.

### IT IS THEREFORE RECOMMENDED:

1.  Plaintiff's motion for a temporary restraining order/preliminary injunction (Doc. 43) should be **DENIED**.

### IT IS THEREFORE ORDERED:

1.  Plaintiff's motions to continue the hearing on his motion for temporary restraining order/ preliminary injunction (Doc. 69) and for "subpoena court assistance" (Doc. 74) are **DENIED** as moot.

2.  Plaintiff's motion for a Rule 35 physical and mental examination and appointment of expert (Doc. 67) is **DENIED**.

Date: 9/9/10

Timothy S. Hogan
United States Magistrate Judge

19

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MUMIN ISRAFIL,                  Case No. 1:09-cv-468
      Plaintiff

                                 Spiegel, J.
    vs                        Hogan, M.J.

BARBARA WOODS, et al.,
      Defendants

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

20

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mumin Israfil #289-920
Warren Corr. Inst.
PO Box 120
State Route 63
Lebanon, OH 45036

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X ☒ Agent
☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)    ☐ Yes

2. Article Number
(*Transfer from service label*)    7002 3150 0000 8389 8817

PS Form 3811, August 2001        Domestic Return Receipt        102595-02-M-1540

1:09 cv 468   (Doc. 79)