# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MUMIN ISRAFIL,

        Plaintiff,

    v.

BARBARA WOODS, et al.,

        Defendant.

Case No. 1:09-cv-468

Spiegel, J.
Bowman, M.J.

## REPORT AND RECOMMENDATION

Plaintiff initiated this suit more than two years ago while incarcerated at the Warren Correctional Institution (WCI) in Lebanon, Ohio.[1]  In his original and amended complaints, Plaintiff alleged that the named defendants exhibited deliberate indifference to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution. Plaintiff also included claims for "retaliation" and "assault" in his second amended complaint.  (Doc. 150 at 3).

Pursuant to local practice, dispositive motions are referred to the undersigned magistrate judge for initial review and a report and recommendation.  *See* 28 U.S.C. §636(b).  Non-dispositive motions are also referred to the undersigned for disposition by order.  Currently pending is Defendants' motion for summary judgment, as well as numerous non-dispositive motions filed by Plaintiff.[2]

---

[1]The record reflects that Plaintiff is currently incarcerated at the Toledo Correctional Institution in Toledo, Ohio (Doc. 188).

[2]The disposition of all pending motions by the undersigned magistrate judge was necessarily stayed when Plaintiff filed an appeal of the Court's prior orders.  The public docket sheet of the Sixth Circuit Court of Appeals reflects that Plaintiff's appeal was dismissed for want of prosecution on

## I. Background

Plaintiff initially filed this prisoner civil rights litigation *pro se*, was appointed counsel for a period of time, and now again proceeds *pro se*. During the period of time in which Plaintiff was represented by counsel, Plaintiff filed a second amended complaint (Doc. 42) which sets forth the essence of Plaintiff's claims. As stated in that complaint:

> This civil rights case challenges the failure of prison officials to provide [Plaintiff] with access to constitutionally required medical care while incarcerated at the Warren Correctional Institution ("WCI"). The suit seeks both injunctive relief and damages for this failure.

(Doc. 42 at 1). In his second complaint, Plaintiff also seeks damages for what he alleges is an escalating pattern of retaliation and physical abuse that he has suffered as a result of complaining about the inadequate medical care. (*Id.*).

Plaintiff names as defendants: 1) Barbara Woods, M.D., a medical doctor at WCI sued in her individual capacity; 2) James Coulter, M.D., a medical doctor at WCI sued in his individual and official capacities; 3) Correctional Officer Sexton, sued in his individual and official capacities; 4) James Does 1-4, mostly[3] unidentified correctional officers at WCI. Plaintiff presents three separate causes of action: 1) denial of medical care by Drs. Woods and Coulter; 2) retaliation in violation of the First Amendment by Defendant Sexton and Defendant Does 1-4; and 3) assault by Defendant Sexton and the John Doe Defendants.

---

November 29, 2011, permitting this Court to proceed on the pending motions. Among the pending non-dispositive motions is Plaintiff's motion to file a belated response to Defendant's motion for summary judgment (Doc. 189). As noted by Defendants (see Doc. 187), Plaintiff's explanations for filing a response out-of-time (See Docs. 181, 189) make no sense. He argues that he was unable to pay mailing costs for filing the response within the time specified by the court, but yet was able to file multiple other documents within the same time frame, using an "inmate free letter" procedure. Nevertheless, the Court has fully considered Plaintiff's response as well as Defendant's reply thereto as if timely filed.

[3] In a motion for leave to file a third amended complaint filed in November 2010, Plaintiff identified one of the unnamed correctional officers as Jennifer Young.

In order to provide context for the discussion of the pending dispositive motion, it is necessary to detail first, a chronological history of Plaintiff's medical treatment, and second, the procedural history of this litigation.

## A. Chronological History of Medical Treatment and Plaintiff's Complaints

Plaintiff's physical problems began in August 2008 when he was accidentally struck by a golf cart on prison grounds, allegedly causing serious injury to his back. Copies of numerous grievances have been filed by Plaintiff in opposition to Defendants' motion for summary judgment and reflect disagreements between the parties from the outset regarding the course of medical treatment provided to Plaintiff.

In a September 29, 2008 Informal Complaint, Plaintiff explains that he refused a trip to the Corrections Medical Center ("CMC") because he was not provided with special accommodations to prevent increased discomfort during the "long bumpy ride" to that facility. Plaintiff also complains about the refusal of his requests for stronger pain medication than Motrin and Tylenol. (Doc. 189-4 at 42). In response to a grievance filed 10/1/2008 regarding his prescribed pain medication, institutional staff noted that Plaintiff had been seen on August 6, 2008 after the accident with the golf cart, and that medical staff had determined that "no treatment was needed" based upon the only injury medically determined to exist, a minor abrasion. (Doc. 189-4 at 38). The Nurse Practitioner further opined based upon her medical judgment that "complaints of pain and injuries do not correlate" with Plaintiff's injury. (*Id.*).

Plaintiff persisted in his complaints, and additional records show that Plaintiff was sent for an x-ray on 8/7/08, with no significant findings, and that Dr. Woods again

examined Plaintiff on 8/7/08, 8/8/08, 8/9/08, and 8/11/08, but found Plaintiff to be "uncooperative." Plaintiff was again seen by medical staff on 8/12/08, 8/15/08, 8/17/08, 8/20/08, 8/21/08, 8/29/08, 9/6/08, 9/9/08, 9/11/08, 9/21/08, 9/23/08 and 10/2/08, but Plaintiff continued to be "uncooperative during those exams," refusing "to go on any round trips to the hospital." (*Id.*).

Plaintiff persisted in seeking additional treatment. In April and May 2009, Dr. Woods ordered MRI scans of Plaintiff's lumbar and cervical spine. (Doc. 189-2 at 3). Plaintiff initially refused to attend an MRI scan on grounds that Dr. Woods failed to order a wheelchair and special accommodations to transport him to that appointment. A complaint form dated 4/18/09 reflects Plaintiff's refusal to attend outside medical appointments based upon his belief that he will experience increased pain and suffering without narcotic pain medication and special transportation provisions. (Doc. 189-4 at 43, 56). However, Defendant Coulter found no medical basis for Plaintiff's demands for a wheelchair and special transportation provisions. (See Doc. 189-4 at 57, reflecting Dr. Coulter's medical assessment "that you can walk, but refuse to walk," and noting that Plaintiff has been observed walking "on several occasions.").

The record reflects Dr. Woods' belief, presumably based upon negative clinical tests, that Plaintiff's complaints might stem from mental health issues. Plaintiff admits that Dr. Woods ordered several mental health consultations based upon "chronic somatic complaints that don't match physical findings." (Doc. 189-2 at 3). Resulting mental health records suggested a "high probability that [Plaintiff's] behaviors are a function of malingering...[and] feigning severe physical illness for secondary gain." (Doc. 167-3 at 1).

On May 15, 2009, Mr. Israfil was involved in an altercation with John Doe

4

Defendants, which he alleges exacerbated his prior symptoms. Plaintiff initially complained that although he was sent to an Emergency Room in Middletown, Ohio six days later and provided with "a shot of pain medication," the ER physician decided after consultation with prison medical authorities to continue the Motrin treatment prescribed by Dr. Woods. (Doc. 1 at 4-5).

On June 12, 2009, Mr. Israfil was scheduled for an appointment with a neurologist at the CMC. (Doc 81 at 6). However, Plaintiff again refused to leave the prison without the use of a wheelchair or special accommodations for transport to the appointment. Defendant Sexton and other correctional officers allegedly handcuffed Plaintiff and carried him to the waiting van in a rough manner. Plaintiff was eventually transported to the emergency room at the Ohio State University Medical Center ("OSUMC") where he was provided with pain medication. (Doc. 81 at 5). A report from Dr. Khan at OSUMC reflects a diagnosis of low back and neck pain and MRI results that show "no acute spinal problems that are in need of surgery or admission to the hospital." Dr. Khan instructs Plaintiff to "take vicodin or percocet for his pain as needed as tylenol #3 has not offered significant relief," and to continue on a prednisone "5 day taper." (Doc. 71-1 at 8). Upon his return to WCI on June 17, 2009, however, Plaintiff complains that his narcotic medication was reduced and eventually discontinued.

On June 22, 2009, Plaintiff submitted an Informal Complaint that referred to his altercation with Defendant Sexton, and stated that it "feels to me as if a [hip] bone is chipped," and that the medical examiner has "ignored my request for an x-ray, CAT, MRI, etc." (Doc. 189-4 at 45). The same complaint requests an additional MRI of Plaintiff's spine to check for changes to his previously diagnosed herniated discs. (*Id.*).

Plaintiff asserts that shortly thereafter he was returned to CMC where he was prescribed Ultram for pain. When he again returned to WCI, Plaintiff alleges that Defendant Woods reduced that medication "in half," causing him increased pain. (Doc. 189-2 at 5). Another informal complaint dated 6/25/09 states that Plaintiff was provided with Ultram every 6 hours for pain while at CMC, but that it was cut to once every 12 hours following his return to WCI. (Doc. 189-4 at 47).

On July 20, 2009, plaintiff was seen for a consultation in the neurosurgery telemedicine clinic, and was again transported to the OSUMC for a physical examination. Again Plaintiff was briefly prescribed narcotic pain medication and prednisone by a Dr. Conley at OSUMC. (Doc. 81 at 9). However, he alleges that Dr. Coulter "refused to provide the treatment ordered." (Doc. 45, ¶24).

A complaint form dated 7/28/09 reflects the same dispute and complaints - essentially that Plaintiff has been prescribed only anti-inflammatory medication that has not been "recommended...outside WCI's medical dept." (Doc. 189-4 at 54). Plaintiff alleges that he was again placed on Ultram in August 2009 at CMC, but that after he returned to WCI Dr. Coulter once again discontinued the Ultram and placed him on Darvocet instead, which was "ineffective." (Doc. 45, ¶25). Prison doctors also have prescribed Plaintiff Motrin, Tylenol, Prilosec, Zantac, and a muscle relaxant. (Doc. 81 at 4, citing Doc. 43-1). However, Plaintiff alleges that none of the medications prescribed by prison doctors have relieved his pain. (*Id.*). Plaintiff requested a cane, bunk and housing accommodations, and more active pain management but all of those requests were denied. (Doc. 81 at 4, citing Doc. 43-1).

In addition to complaints about the efficacy of his pain medication, Plaintiff

submitted a complaint form on June 25, 2009 reflecting his belief that blood pressure checks ordered by medical staff are "being taken irrelevantly [sic] to the nerve problem identify [sic] by the OSU doctors" such that Plaintiff is "declin[ing]" those tests absent proof of "useful relevance to adequately treating my back." (Doc. 189-4 at 46). Plaintiff also complains that if he has developed high blood pressure, it stems from the allegedly inadequate pain relief provided to him. (*Id.*).

### B. Procedural History of this Litigation[4]

In addition to the medical chronology underpinning Plaintiff's Eighth Amendment claims, the procedural background of this litigation, as summarized in prior Reports and Recommendations ("R&Rs"), is repeated herein for the convenience of this Court. In a September 9, 2010 R&R, the Court summarized the initial proceedings, including the facts most relevant to Plaintiff's Eighth Amendment claim involving the denial of adequate medical care:

> Plaintiff initially filed this action pro se against WCI Chief Medical Officer Barbara Woods alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment. (Doc. 1). Plaintiff's original complaint

---

[4]The electronic case management system of this Court reflects that Plaintiff has pursued a total of six civil rights complaints to date. The instant case was previously consolidated with Civil Case No. 11-cv-28-SAS-SKB, but all claims in the latter case were dismissed on June 24, 2011.

In addition, Plaintiff filed separate litigation on February 10, 2010 against another official at WCI, Mona Parks, alleging that Ms. Parks failed to enforce regulations pertaining to Plaintiff's round-trip transportation to a pain clinic while at WCI and failed to correctly manage grievances pertaining to the same. Plaintiff sought to amend his complaint in that case to further allege the denial of adequate health care by two shift commanders. *Israfil v. Parks*, Civil Case No. 2:10-cv-132-EAS-MRA. On June 22, 2011, Plaintiff's claims in that case were dismissed on summary judgment, and leave to amend was denied on grounds that Plaintiff could have brought the same claims in this case, but failed to timely do so. (Doc. 51).

Finally, two other civil rights cases have been filed by Plaintiff and previously dismissed, while a third more recently filed case remains pending in the Columbus division of this Court: Civil Case No. 1:10-cv-92-SSB-TSH (dismissed for failure to state a claim) and Civil Case No. 3:94-cv-64-WHR-MRM (dismissed for lack of subject matter jurisdiction); and Civil Case No. 2:11-cv-385-EAS-TPK (pending). In his most recently filed case, Plaintiff asserts claims under the Americans With Disabilities Act for violations of his rights based upon the treatment he has received while incarcerated at two different institutions, including WCI. (Doc. 19).

alleged that as a result of injuries he suffered after being struck from behind by a golf cart being driven by a WCI employee, he suffers from a back condition which causes him severe pain and renders him unable to walk. His original complaint alleged that defendant Woods denied his requests for a walking cane, bottom bunk restriction, and stronger pain medications to treat his injuries. He also alleged that defendant Woods refused to administer pain medication in the dosage and with the frequency previously prescribed by specialists at the Ohio State University Hospital and the Corrections Medical Center after he was diagnosed with herniated lumbar discs. *Id.*

In view of the serious nature of plaintiff's allegations, the Court requested the assistance of the attorneys from the Ohio Justice and Policy Center to represent plaintiff in this case. (Doc. 32). Counsel agreed to the appointment and filed an amended complaint and motion for temporary restraining order/preliminary injunction on plaintiff's behalf. (Docs. 42, 43).

A hearing on the motion was scheduled for June 28, 2010. In the meantime, counsel for plaintiff and defendants attempted to resolve the medical issues raised by the motion for temporary restraining order/preliminary injunction without Court intervention. This included an agreement to have plaintiff undergo an independent medical examination by Dr. Carole Miller, M.D., a neurosurgeon at the Ohio State University Medical Center, to determine the status of plaintiff's medical condition and recommendations for treatment. The undersigned traveled to the Warren Correctional Institution on June 10, 2010 to have a face-to-face meeting with Mr. Israfil and help facilitate communication between Mr. Israfil, all counsel, and the Court in an effort to reach a speedy resolution of the medical issues raised by plaintiff's motion.

Thereafter, the parties agreed to stay the hearing on the motion pending the independent medical examination by Dr. Miller. (Doc. 57). The parties were ordered to advise the Court whether a hearing on the motion would be necessary following the examination by Dr. Miller. *Id.*

On July 29, 2010, Mr. Israfil underwent an examination by Dr. Miller at the Outpatient Clinic at the Ohio State University Hospital.

On August 18, 2010, Mr. Israfil filed a pro se motion for removal of his appointed attorneys based on fundamental disagreements about the course of representation in his case. He also moved for the appointment of successor counsel. (Doc. 63). Following a telephone conference with the Court at which pro se plaintiff Mumin Israfil, his counsel, and counsel for defendants were present, the Court granted Mr. Israfil's motion for removal of appointed attorney. (Doc. 66). However, the Court denied Mr. Israfil's request for successor counsel because it was apparent to the undersigned from Mr. Israfil's court filings and letters, as well as the Court's face-to-face

meeting with Mr. Israfil, that he believes his approach to this litigation is the best one and that appointment of successor counsel would be futile. *Id*.

(Doc. 81 at 2-3).

In the report filed with the court following her July 2010 examination of the Plaintiff, Dr. Miller explained that she could not "state with reasonable medical certainty...whether or not [Mr. Israfil] has a significant neurologic abnormality which may be producing the inability to walk and the complaints he has." She additionally opined that "there may be a psychiatric component here and ...this may be a type of hysterical conversion reaction or malingering." Due to Dr. Miller's inability to determine any "anatomic or objective substrate to account for his inability to walk," she recommended follow-up testing, including a cervical MRI with and without contrast, both lower and upper extremity EMG and nerve conduction velocities, and neuropsychiatric testing. (Doc. 81 at 11). However, Plaintiff flatly refused to undergo further medical evaluations or tests. (Doc. 81 at 12).

After a hearing held on September 7, 2010, Magistrate Judge Hogan[5] recommended that Plaintiff's motion for TRO/preliminary injunction be denied, based upon Plaintiff's failure to meet his burden to show a likelihood of success on the merits of his Eighth Amendment claim. (*Id*. at 18). Judge Hogan's R&R was adopted by the presiding district judge, over Plaintiff's objections, on February 3, 2011 (Doc. 150).

On January 10, 2011, the undersigned filed an R&R recommending among other things, that all claims against Defendant Jackson in this case and in another related case be dismissed. (Doc. 140). That Report and Recommendation was adopted by the

---

[5] Magistrate Judge Hogan retired during the pendency of this litigation, and the case ultimately was reassigned to the undersigned magistrate judge.

9

presiding district judge over Plaintiff's objections on June 24, 2011 (*See* Doc. 182). By separate Order filed on January 10, 2011, the Court granted Plaintiff's unopposed motion to amend his complaint to identify one of the previous John Doe Defendants as Correctional Officer Jennifer Young. Although the amended complaint was initially tendered as an exhibit to the motion to amend, it has never been filed of record, no summons has ever been issued, and Officer Jennifer Young has never been served or appeared through counsel.

## II. Defendants' Pending Motion for Summary Judgment

Following the conclusion of discovery on April 29, 2011, Defendants filed a motion for summary judgment (Doc. 167). Defendants contend they are entitled to judgment on five grounds: 1) because Plaintiff cannot show that he has a serious medical need with respect to which any Defendant has been deliberately indifferent; 2) because Plaintiff failed to exhaust administrative remedies concerning Defendant Sexton; 3) because Plaintiff has failed to demonstrate any personal involvement by any Warden; 4) because some of Plaintiff's claims are overly vague and conclusory; and 5) because all Defendants are entitled to qualified immunity. In addition to the arguments propounded by defense counsel, the Court *sua sponte* will address claims against Defendants named in their official capacities, and claims against Jennifer Young and other John Doe Defendants.

### A. Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir.2007) (internal

quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

11

Although reasonable inferences must be drawn in favor of the opposing party, *see Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, inferences are not to be drawn out of thin air. Rather, it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244-45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"*Matsushita,* 475 U.S. at 587, 106 S.Ct. 1356 (citation omitted).

In this case, Plaintiff has failed to present anything more than his own conclusory allegations in support of his claim of deliberate indifference to his serious medical needs. Conclusory allegations, standing alone, are insufficient to demonstrate a genuine issue for trial. Therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's claims of inadequate medical care. By contrast, Defendants are not entitled to summary judgment on Plaintiff's retaliation and assault claims, to the extent that Plaintiff has stated a claim against some Defendants in their individual capacities.

**B. Defendants' Five Arguments**

**1. Plaintiff's Failure to Prove Any Eighth Amendment Medical Claim**

Although Plaintiff has alleged deliberate indifference to his serious medical needs by the two institutional physicians, Drs. Woods and Coulter, and particularly to his alleged inability to walk, Plaintiff is unable to demonstrate any medical basis for his claimed inability to walk. Moreover, until he was transferred to another prison, Plaintiff continually refused

medical testing that could help identify any physical or psychiatric issues relating to his claimed ailments. Therefore, Defendants contend that Plaintiff's claims amount to no more than a medical disagreement between Plaintiff and his treating physicians at WCI as to whether he required a wheelchair, cane, prescription medication or other medical care. Defendants argue that Plaintiff suffers from nothing more serious than a voluntary *unwillingness* to walk, rather than an inability to walk. They argue that their refusal to supply "treatment" demanded by Plaintiff does not amount to a violation of the Eighth Amendment, because Plaintiff cannot show that he has a serious medical need.

Proof of deliberate indifference requires more than a mere showing of negligence, and requires at a minimum that the named defendants were actually aware of a danger and consciously disregarded it. The standard has been described as akin to "criminal recklessness," *Weaver v. Shadoan,* 340 F.3d 398, 410 (6th Cir. 2003), which exceeds gross negligence. The relevant test has both an objective and a subjective component. First, with respect to the objective component, Plaintiff must prove that the alleged deprivation of medical care is "objectively, sufficiently serious," such that he was denied "the minimal civilized measure of life's necessities." *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994). The failure to provide care or the delay in care must have exposed Plaintiff to a "substantial risk of serious harm." *Id.* at 828.

Second, to prove the subjective element of his claim, Plaintiff must show that the prison officials actually knew of and disregarded "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer v. Brennan*, 511 U.S. at 837. The subjective component exists "to prevent the constitutionalization of medical malpractice claims." *Cornstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "[A]n official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* (emphasis original, quoting *Farmer*, 511 at 838).

In order to prove his claim, then, Plaintiff must show that each of the two prison physicians named as Defendants was aware of facts from which he or she could draw the inference that a substantial risk of serious harm existed, and that he or she actually drew that inference. Plaintiff must prove both elements of his claim by a preponderance of the evidence. *Brooks v. Celeste*, 39 F.3d 125, 127-128 (6th Cir. 1994). Defendants argue persuasively that Plaintiff cannot satisfy either element of his claim against Drs. Woods or Coulter.

### a. Failure to Satisfy Objective Component of Claim

Plaintiff and Defendants clearly disagree about whether or not Plaintiff suffers from any ailment that prevents him from walking, and what medical treatment is appropriate for Plaintiff's various conditions. Plaintiff has submitted some evidence[6] that he was diagnosed with two herniated discs in his lumbar spine on or about June 12, 2009. He alleges that pain from his herniated discs was so severe that he could not walk while at WCI (Doc 189-2 at 4). However, the medical records to which Plaintiff refers are

---

[6]See Doc. 189-4 at 12, OSUMC discharge instructions stating in part: "You have been diagnosed with a herniated disk (commonly referred to as a 'slipped disk')." Although Plaintiff was provided with a complete copy of his medical records during discovery, very few medical records have been filed of record.

insufficient to support his claims, all of which involve allegations of inadequate care, rather than a complete denial of care.

> The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas,* 537 F.2d 857, 860 n. 5 (6th Cir.1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.; see also Perez v. Oakland County,* 466 F.3d 416, 434 (6th Cir.2006); *Kellerman v. Simpson,* 258 F. App'x 720, 727 (6th Cir.2007); *McFarland v. Austin,* 196 F. App'x 410 (6th Cir.2006); *Edmonds v. Horton,* 113 F. App'x 62, 65 (6th Cir.2004); *Brock v. Crall,* 8 F. App'x 439, 440 (6th Cir.2001); *Berryman v. Rieger,* 150 F.3d 561, 566 (6th Cir.1998).

*Green v. Curtin*, 2011 WL 206137, *4 (W.D.Mich.,Jan. 20, 2011).

Defendants do not contest that Plaintiff was at one point diagnosed with two herniated discs, but vehemently contest Plaintiff's contention that he cannot walk and/or that he can satisfy the objective component of his Eighth Amendment claims. The specific conduct of which Plaintiff complains is that Defendant Dr. Woods: 1) failed to provide adequate care for injuries Plaintiff sustained after he was struck with a golf cart on August 6, 2008; and 2) failed to provide adequate treatment for injuries sustained after a May 15, 2009 incident involving John Doe Defendants. (Doc. 42 at ¶¶ 14-16). Plaintiff further complains that Defendant Dr. Coulter, who replaced Dr. Woods as the institutional physician at WCI: 1) forced Plaintiff to stand and "pushed his knuckles deep into Mr. Israfil's spine, causing excruciating pain and involuntary urination" during a medical examination conducted in July 2009; 2) refused to provide treatment prescribed by consulting physicians and discontinued prescribed medications, without medical justification; and 3) refused to provide adequate medical treatment or medication for

Plaintiff's back and neck injuries.

None of the alleged conduct satisfies the objective component of an Eighth Amendment claim for deliberate indifference to a serious medical need. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285 (1976)(rejecting plaintiff's complaint of inadequate treatment for back pain). To the extent that Plaintiff complains about the treatment administered by either physician, he alleges no more than a disagreement with the medical judgments of the prison doctors, or at most, a claim of negligence or malpractice not cognizable under 42 U.S.C. §1983. *Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir. 1996). During the period of time that Plaintiff was incarcerated at WCI after the August 6, 2008 accident, Plaintiff frequently and regularly received a substantial amount of medical care. As referenced by Plaintiff himself in a declaration dated March 25, 2010, between August 2008 and May 2009, "Mr. Israfil repeatedly made institutional medical staff, including defendant Woods, aware of his injuries and pain through medical visits and the inmate grievance procedure." (See Doc. 81 at 4, citing Doc. 43-1, Israfil Declaration). Prison records submitted by Defendants reflect numerous additional visits during Dr. Coulter's tenure at WCI.[7]

The heart of Plaintiff's complaint is that both Defendant physicians exhibited deliberate indifference through inadequate pain management, leading to Plaintiff's inability to walk and incontinence. However, the precise nature and severity of Plaintiff's back

---

[7]Although not all medical records have been filed, Defendants' evidence includes institutional records that summarize Plaintiff's care. Plaintiff does not dispute that evidence, but rather, challenges only the adequacy of the care he received.

condition are highly disputed. It is true that disputed issues of fact are generally construed in the non-moving party's favor on summary judgment. However, that does not mean that Plaintiff is entitled to a presumption by this Court that he suffers from some objective ailment that prevents him from walking when *no medical evidence at all* supports that assertion.

Defendants deny that Plaintiff suffers from any objectively serious condition that could cause Plaintiff's alleged level of excruciating pain, incontinence, or an inability to walk. It was to help resolve this dispute that the parties agreed to an independent medical examination by Dr. Miller at The Ohio State University. This Court previously summarized Dr. Miller's findings:

> Dr. Miller's July 29, 2010 report indicates that she reviewed previous medical records for Mr. Israfil. These included a June 2009 lumbar MRI scan which showed mild or moderate disc degeneration and disc bulge at L4-5, and an April 2009 cervical MRI scan which showed multilevel cervical degenerative disc disease with forminal narrowing. (Doc. 68, Exh. A-1). Dr. Miller also reviewed Mr. Israfil's history and performed a physical examination of Mr. Israfil. Dr. Miller stated that previous testing indicates Mr. Israfil has moderate cervical spondylosis and underlying cervical and lumbar degenerative disc disease. Dr. Miller opined that "[t]hese conditions can lead to and cause chronic pain." *Id*. Because Dr. Miller did not have a follow-up cervical MRI scan or EMGs following the additional injuries plaintiff alleged to have occurred in 2009, she could not "absolutely rule out the possibility of a cervical myelopathy as causing the current weakness in his legs."

(Doc. 81 at 10). Dr. Miller stated that she suspected "a significant functional aspect" but could not determine any clear basis for Plaintiff symptoms. She further explained:

> I also believe that based on my evaluation, there may be a psychiatric component here and that this may be a type of hysterical conversion reaction or malingering. However...I am unable, without further testing able to state, whether he does or does not have an anatomic or objective substrate to account for his inability to walk. I suspect he does not but do not have sufficient information at the present time.

(Doc. 81 at 11, quoting report).

Due to the insufficient clinical records, Dr. Miller ordered additional MRI and EMG testing, as well as neuropsychiatric testing and evaluation by a neuropsychologist. (Doc. 81 at 11). However, as of August 31, 2010, Plaintiff refused to participate in the recommended tests. (Doc. 81 at 12). This Court noted: "Now that Dr. Miller's report suggests there may be a psychiatric component to plaintiff's problems, he objects to the report." (Doc. 81 at 16).

Records confirm that Plaintiff has refused prescribed care, medical tests, and treatment on multiple occasions.[8] Plaintiff refused chronic care visits to the medical department on March 17, 2010 and May 19, 2010. (*See* Doc. 81 at 9, citing Doc. 68, Exh. A; see also Doc. 167-2 at 2). He refused an examination by Dr. Coulter on April 7, 2010, at which time Dr. Coulter warned him "that he risked debilitatation and atrophy of his muscles if he continued to not walk." (167-2 at 2). Plaintiff refused physical therapy as directed by the orthopedic center at OSU on April 21, 2010. (*Id.*). On July 15, 2010, he refused to see the nurse practitioner. (*Id.*). On August 3, 2010, he refused to attend another MRI test. (*Id.*). An affidavit attached to Defendant's motion reflects that Plaintiff specifically rejected testing ordered by Dr. Coulter, including an MRI, EMGs, and neuropsychiatric testing. (See Doc. 167-2 at 2; see also 189-4 at 62-67, discussing

---

[8]Plaintiff contends that he refused to participate in recommended tests only when such tests were irrelevant, or when special accommodations for comfortable transportation (in Plaintiff's view) were not made by prison authorities. In a motion to strike some of the evidence of his refusal to undergo testing (Doc. 179), Plaintiff argues that he would have been willing to participate in testing concerning his low back or lumbar spine, but did not believe the recommended tests (relating to his cervical spine and blood pressure, among other things) were relevant. As discussed *infra*, Plaintiff's complaints amount to no more than a difference in opinion with his physicians regarding the appropriate testing to be conducted and/or treatment plan, and do not state a claim for deliberate indifference.

refusals to undergo testing, refusal to attend appointments absent wheelchair and special accommodations for transportation).

On January 4, 2011, Plaintiff refused to attempt to walk, telling the nurse "Hell no, I don't have to and I'm not going to." However, Plaintiff was "able to get up and transfer into a wheel chair with a steady gait." (*Id*. at 3). Defendant Coulter also has offered evidence that Plaintiff refused a cane offered by Dr. Coulter, telling that Defendant "I could stand and walk but I am not gonna." (*Id*.). (*See also* 189-4 at 53, Plaintiff's written complaint explaining that he refused Dr. Coulter's offer of a cane and Motrin because Plaintiff believed Dr. Coulter was offering inappropriate treatment).

Eventually, Plaintiff agreed to the recommended testing after being transferred to Ross Correctional Institution (RCI) in Chillicothe, Ohio. Plaintiff participated in an EMG of lower and upper extremities and an MRI of the lumbar spine ordered by the RCI medical director, Dr. Gary Krisher. However, those tests showed "no medical reason why Israfil should be unable to walk." (Doc. 167-2 at 2). Thus, Dr. Krisher opined on March 7, 2011 that there was no medical reason for Plaintiff to fail to ambulate, noting Plaintiff's "long history of exaggerating symptoms and making claims for which no objective evidence could be found." (Doc. 167-3 at 1). Dr. Krisher offers numerous examples, including reference to "a note from The OSU Medical Center stating that his decreased sensation complaints do not fit a dermatome pattern," and that he had "refused any work up including an MRI" to diagnose the reason for a "sudden onset of incontinence" which "has apparently now spontaneously resolved." (*Id.*). Dr. Krisher also references the mental health records suggesting a "high probability" that Plaintiff's claimed symptoms demonstrate "malingering" and feigned illness. (*Id.*).

19

The records filed by Plaintiff in response to Defendant's motion for summary judgment include numerous grievances complaining of Defendants' failure to supply a wheelchair. However, there is no objective evidence that Plaintiff had any medical need that *required* use of a wheelchair or other special provisions for transport to medical appointments. Defendant's responses to the grievances explain that no medical authority has determined any medical need for a wheelchair, and reflect staff observations of Plaintiff walking on numerous occasions without apparent difficulty. (Doc. 189-4 at 49-50). *See e.g., Watson v. Mich. Dep't of Corrections*, 2009 WL 1181906 at *4 (E.D. Mich. April 30, 2009)(prison official's denial of wheelchair recommended by surgeon was no more than disagreement over treatment or course of action, and did not rise to the level of an Eighth Amendment claim).

In its prior R&R dated September 9, 2010, this Court previously warned Plaintiff that the absence of "medical proof" meant that he "failed to meet the objective component of his Eighth Amendment claim in this case." The Court's prior analysis bears repeating:

> The objective component of the adequate medical care test is satisfied [w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however, the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001). Unlike cases where the seriousness of the injury or illness is obvious to even a lay person, here the seriousness of plaintiff's leg weakness or back pain cannot be discerned without <u>competent medical proof</u>. *Blackmore*, 390 F.3d at 899.

(Doc. 81 at 15)(emphasis added).

More than a year ago, this Court held that Plaintiff had failed to present "clear and

convincing evidence that he suffers from a serious medical condition that causes the pain and extreme limitations in walking." (*Id*. at 15-17). In response to Defendant's motion for summary judgment, Plaintiff has failed to put forth any evidence at all that he suffers from any such condition. As the Court previously noted, the "reports from the Ohio State Medical Center do not explain Mr. Israfil's current functioning." Dr. Miller's report, while acknowledging the *possibility* of chronic pain, also denied that any medical evidence then of record supported the extent of Plaintiff's claimed pain and limitations. Plaintiff initially refused further testing on grounds this Court found to be "disingenuous." (See Doc. 81 at 15; Doc. 150 at 4-5). Although Plaintiff finally participated in testing after being transferred to RCI, that testing failed to substantiate any medically determinable reason for Plaintiff's claimed ailments.

The record as a whole shows that Plaintiff has received not only regular and frequent care, but care that is far in excess of that required by the relatively minimal standards of the Eighth Amendment. Plaintiff has failed to come forward with any evidence at all showing that the care he received was objectively seriously harmful to him, or that either physician was deliberately indifferent to his medical needs. *See Atakpu v. Lawson*, 1:05-cv-00524-SAS, 2008 WL 5233467 (S.D. Ohio Dec. 11, 2008)(inmate who received regular medical care for his shoulder condition could not overcome motion for summary judgment).

Plaintiff's complaints concerning changes to his pain medications by the Defendants similarly fail to state a violation of a clearly established constitutional right. While pain is obviously subjective, the Defendants have submitted uncontroverted evidence that no

objective medical reasons have been determined for Plaintiff's asserted level of chronic back pain. To the contrary, records reflect the Defendant physicians' belief, based upon clinical tests, staff observations, and psychological records, that Plaintiff is malingering or feigning his complaints.

The issue of medication choice is nearly always an issue of medical judgment, which fails to rise to the level of a constitutional violation. *See Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)(differences in judgment between an inmate and prison medical personnel regarding appropriate medical treatment are not enough to state a deliberate indifference claim). Time and time again, courts have determined that claims similar to Plaintiff's simply do not rise to the level of an Eighth Amendment violation. Perhaps not surprisingly, disputes about the amount and kind of pain medications prescribed by prison doctors are relatively common. However, courts have made clear that there is no constitutional right to receive unlimited narcotic pain medication for an indefinite period of time. *See Wolfel v. Farley-Morford*, 2009 WL 4547561 (S.D. Ohio December 1, 2009)(inmate complaining of discontinuation of Ultram in favor of Celebrex for back pain failed to state claim); *see also Reed v. Sapp*, 211 F.3d 1270, 2000 WL 571994 (6th Cir. 2000)(Table, text available in Westlaw)(inmate who believed he required more aggressive treatment for chronic back pain failed to show health threat in violation of Eighth Amendment, rather than mere discomfort or disagreement with medical opinion); *Jones v. Ehlert*, 704 F. Supp. 885, 888-890 (E.D. Wis. 1989)(no deliberate indifference found where prisoner's Valium was discontinued after prisoner accused of palming medication).

Common experience, as well as abundant examples found in case law, teaches that

back pain can be intractable and difficult to alleviate.  As is evident on the record presented, such cases challenging the adequacy of pain management usually state, at most, claims for negligence.  *See generally Buck v. Harwood*, 2007 WL 634447 (N.D. Ohio Feb. 22, 2007)(where there was no objective evidence to support Plaintiff's belief that screws in his ankle were broken, and Plaintiff failed to present any evidence to establish that Defendant's treatment of his chronic pain constituted an excessive risk to the inmate's health or safety, institutional physician entitled to summary judgment); *Davis v. Antonini*, 2007 WL 674586 *6 (Feb. 7, 2007)(Defendant responded reasonably to Plaintiff's clinically unsubstantiated complaints of pain - decision to discontinue use of wheelchair was based on medical judgment); *Soto v. Kimsel*, 2005 WL 1968818 (W.D. Mich. Aug. 16, 2005)(failure to provide wheelchair following determination that Plaintiff did not have medical need for wheelchair did not rise to the level of Eighth Amendment violation).

Defendants' medical decisions to decrease or eliminate narcotic or opiate pain medication briefly prescribed by other physicians while Plaintiff was temporarily housed at other medical facilities for acute care, does not amount to an Eighth Amendment violation. Objective test results have never supported Plaintiff's asserted level of chronic pain, and the Defendant physicians had evidence, including staff observations and Plaintiff's complete psychiatric and medical records, that supported their medical decisions to decrease previously prescribed narcotic pain medication in favor of anti-inflammatory medication for long-term use.  *See Acord v. Brown*, 43 F.3d 1471 (Table, text available in Westlaw)(6th Cir. Dec. 5, 1994)(neither decision to prescribe treatment that differed from previously prescribed treatment, nor difference in opinion between prisoner and medical

staff about adequacy of treatment constitute deliberate indifference); *DeFreeze v. Zuberi*, 39 Fed. Appx. 137, 138-39, 2002 WL 857747 (6th Cir. 2002)(same).

At the very most, Plaintiff's complaints that the Defendants inappropriately reduced Plaintiff's pain medication states a claim for simple negligence, not a violation of the Eighth Amendment. Where an inmate has received medical attention, and merely disputes the adequacy of that treatment, federal courts are reluctant to second-guess the medical judgments of prison officials and constitutionalize claims that sound in state tort law. *Westlake*, 537 F.2d at 860, n.5. Other than his own unsubstantiated allegations, Plaintiff has failed to submit any competent medical evidence that any harm resulted from the Defendants' treatment. Courts reviewing far more serious allegations of medical negligence have found no violation of the Eighth Amendment when no serious harm resulted. *Compare Napier v. Madison County*, 238 F.3d at 742 (no evidence that harm resulted from missed dialysis treatment); *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004)(delay in medical attention for more than two days in face of obvious appendicitis did not require verification of resulting harm); *see also Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005)(lack of evidence that delay for nearly 8 hours in obtaining treatment for heart attack had had detrimental effect precluded finding of objectively serious deprivation of medical care). In short, Plaintiff's own records refute any possibility of his allegations meeting the deliberate indifference standard.

One other claim regarding Dr. Coulter warrants brief discussion. At his first appointment with Dr. Coulter in July 2009, Plaintiff alleges that Dr. Coulter "forced Mr. Israfil to stand and then pushed his knuckles deep into Mr. Israfil's spine, causing

excruciating pain and involuntary urination" and subsequently wheeled him into a crowded waiting room and left him for over an hour "in pain and humiliated." (Doc. 42 at ¶ 20). As a result of Dr. Coulter's actions, Plaintiff complains that he experienced "constant urination and bowel movement sensations and an increase in incontinence episodes." (*Id.* at 21). A written complaint form submitted by Plaintiff in response to Defendant's motion for summary judgment alludes to the incident as having been caused by Dr. Coulter's attempted "chiropractic/spinal alignment techniques" on Plaintiff. (Doc. 189-4 at 54). However, a response to a complaint dated 7/16/10 concerning his request for adult diapers and incontinence treatment explains that OSU physicians did not order diapers and that "there is no medical condition" identified by any medical authority that would require diapers or similar treatment. (Doc. 189-4 at 61). The records presented by Plaintiff regarding this incident again fail to substantiate any objective claim of medical harm caused by the incident in question. The medical treatment technique administered by Dr. Coulter - even though Plaintiff disagreed with its efficacy- did not itself arise to the level of deliberate harm.

### b. Subjective Element

In addition to warning Plaintiff of his failure to satisfy the objective component of his deliberate indifference claim, this Court clearly stated more than a year ago that Plaintiff had failed to establish the subjective component of his Eighth Amendment claim. (Doc. 81 at 17). In response to Defendants' motion for summary judgment, Plaintiff has failed to offer any additional proof to satisfy the requisite subjective component of his claim against either physician. In fact, there is simply no evidence, other than Plaintiff's

subjective reports, that Plaintiff actually experienced any harm from any treatment provided to him.

Even if either of the Defendant physicians "could" have inferred that refusing Plaintiff a wheelchair or altering his pain medication or other treatment placed him at a substantial risk of harm, there is no evidence that either Defendant physician actually drew such an inference. Absent evidence that either Defendant knew of facts from which he or she could infer that a substantial risk of serious harm existed *and* that he or she drew that inference and consciously disregarded it, both physicians are entitled to summary judgment.

Courts have consistently held that an error in judgment or even appreciation of an increased risk does not arise to a constitutional violation. Thus, even if the Defendants physicians were wrong in their assessment that Plaintiff was feigning his symptoms or malingering, that would not rise to the level of deliberate medical indifference. *See Johnson v. Quinones*, 145 F.3d 164, 169 (6th Cir. 1998). Considering the extensive medical care provided to Plaintiff, including an independent medical evaluation and multiple objective tests that have failed to reveal any basis for Plaintiff's claimed ailments, as well as Plaintiff's frequent refusals of prescribed testing and treatment, the Defendants are entitled to summary judgment.

### 2. Exhaustion of Claims Concerning the June 12, 2009 Incident

Plaintiff's third claim for assault involves conduct by Defendant Sexton on June 12, 2009. As a second ground in favor of summary judgment, Defendant Sexton argues that he is entitled to judgment based upon Plaintiff's failure to exhaust his administrative remedies concerning that Defendant's conduct.

The incident of which Plaintiff complains began when Defendant Sexton refused Plaintiff's request for a wheelchair "to help [Plaintiff] access the bus transporting him to CMC" for a medical appointment. Plaintiff alleges that Defendant Sexton "carried Mr. Israfil by his handcuffs and jumpsuit toward the bus, ignoring Mr. Israfil's cries of pain and physically assaulting him en route to the bus." (Doc. 42 at 5, ¶ 17). According to Plaintiff, upon his return to the institution, he was placed in disciplinary segregation because he filed a grievance against Captain Sexton concerning the same incident. Plaintiff filed this lawsuit on July 7, 2009, approximately one month after the incident occurred.

Defendants argue that this particular "assault" claim is barred because Plaintiff did not appeal the denial of his grievance until July 25, 2009, 18 days *after* he filed this lawsuit. The Chief Inspector requested additional time to review the final appeal of the grievance, and Plaintiff did not receive a final decision from the Chief Inspector until ten and a half months later, on June 9, 2010. Defendants argue that exhaustion under the Prison Litigation Reform Act cannot be completed after suit is initiated, but instead must be fully completed prior to suit.

In response, Plaintiff first points out that he did not pursue any claims against Captain Sexton until he filed an amended complaint on March 25, 2010, many months after he filed his July 2009 appeal of the denial of his grievance. (Doc. 42). In fact, several appellate courts have held that the PLRA does not preclude the addition of new and different claims through the filing of an amended complaint following exhaustion. *See Rhodes v. Robinson*, 621 F.3d 1002 (9th Cir. 2010); *Barnes v. Briley*, 420 F.3d 673 (7th Cir. 2005); *see also Curry v. Scott*, 249 F.3d 493 (6th Cir. 2001).

However, Plaintiff admits that his administrative appeal had not been fully resolved at the time Plaintiff filed his second amended complaint. Thus, arguably, Plaintiff's complaint remains subject to dismissal. *See Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). Nevertheless, dismissal is inappropriate on the facts presented. Plaintiff filed suit against Defendant Sexton and the John Doe Defendants only after many months had elapsed since the Chief Inspector notified Plaintiff that additional time was required to resolve his administrative appeal. Most federal courts, including the Sixth Circuit, have excused a failure to exhaust where plaintiffs file federal suit *after* prison officials failed to respond within the time limits set forth by the applicable grievance procedure. *See Boyd Corrections Corp. of America*, 380 F.3d 989, 996 (6th Cir. 2004)(citing *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002) ("[W]e agree that the failure to respond to a grievance *within the time limits contained in the grievance policy* renders an administrative remedy unavailable[.]")); *Powe v. Ennis,* 177 F.3d 393, 394 (5th Cir. 1999) (per curiam) ("A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed *and the state's time for responding thereto has expired*.") (emphasis added));*see also Ketzner v. Douglas*, No. 08-cv-13299, 2009 WL 1655004, at *2 (E.D. Mich., June 11, 2009) (finding exhaustion, based on plaintiff's filing his federal action after the time for the Chief Inspector to respond had expired). In at least one case presenting similar facts, this Court excused an inmate's failure to exhaust where the Chief Inspector had failed to respond to an appeal months after indicating that additional time would be needed. *See Taylor v. Doctor McWeeney*, No. 1:05-cv-155, 2005 WL 1378808, at *2 (S.D. Ohio May 27, 2005), *Report and Recommendation* adopted at 2006 WL 1540446 (S.D. Ohio Oct. 27,

2005) (Dlott, J.) (unreported).   Therefore, Defendant Sexton is not entitled to summary judgment based upon Plaintiff's failure to fully exhaust his claims at the administrative level.[9]

### 3.   Personal Involvement of Named Defendants

The third ground advocated by Defendants in favor of judgment - the lack of personal involvement of any named Warden Defendant- is legally supported, but factually irrelevant to this case in its current posture.

A supervisor cannot be held liable under 42 U.S.C. §1983 unless he or she directly participated in or encouraged the alleged violation of constitutional rights.  *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994).  Defendants argue generally that they are entitled to judgment as to any claim against "Defendant Jackson" (the Warden of WCI at the time suit was filed) and as to the current Warden of WCI, based upon Plaintiff's failure to demonstrate that either Warden bore any personal responsibility for the allegedly unconstitutional actions. The undersigned previously recommended the dismissal of all claims against Defendant Warden Jackson (Doc. 140) in both her individual and official capacities, and that R&R was adopted by the presiding district judge on June 24, 2011 (Doc. 182).  Therefore, any arguments concerning Defendant Jackson or the replacement Warden at WCI are moot.

---

[9]Plaintiff presents two additional and alternative arguments against the application of exhaustion but neither has merit.  First, Plaintiff argues that his failure to exhaust should be excused because such failure is attributable to the ineffectiveness of his former lawyer.  No authority supports excusing the requirement based upon the alleged mistake of civil counsel.  Plaintiff also asserts that the exhaustion requirement should be waived based upon Defendants' alleged failure to comply with time limits set by the Attorney General, but the cited regulation was deleted upon enactment of the Prison Litigation Reform Act (PLRA).

Following dismissal of all claims against Warden Jackson, the Plaintiff has never identified the present Warden of WCI as a named defendant. Although the Court agrees that Plaintiff has failed to show any personal involvement by any other Warden of WCI, any arguments pertaining to the subsequent Warden are irrelevant to this case. *See generally Israfil v. Parks*, Civil Action No. 2:10-cv-132, 2011 WL 2491574 (S.D. Ohio June 22, 2011)(affirming summary judgment to assistant chief inspector based upon failure to demonstrate personal involvement in decision to deny wheelchair for transport to medical appointments).

### 4. "Vague and Conclusory" Retaliation Claims

Defendants additionally argue that they are entitled to dismissal of Plaintiff's "retaliation" claim as overly "vague and conclusory," to the extent that Plaintiff merely alleges "retaliation, threats of a transfer to SOCF that never occurred, change in security level, etc." (Doc. 167 at 17). However, Plaintiff's second amended complaint specifically alleges that "[i]n retaliation for Plaintiff's persistent complaints about his medical needs, Defendant Sexton and Defendants Doe 1-4 have physically injured Mr. Israfil."[10]

In response to Defendants' motion, Plaintiff has submitted copies of grievances, as well as an unofficial copy of his deposition, wherein he details alleged assaults that occurred in May and June 2009, purportedly in retaliation for his persistent requests for medical attention and prior grievances concerning related issues. In fact, Defendant Sexton is not seeking summary judgment on the merits of Plaintiff's excessive force claim against him or the John Doe Defendants. Although this Court has determined that Plaintiff

---

[10]Plaintiff further alleges that "Defendant Jackson threatened to transfer Mr. Israfil" to a maximum security facility, but that defendant has already been dismissed from this litigation.

had no obvious medical need for a wheelchair, such that his refusal to walk to the bus for transport to medical appointments may have been a disciplinary issue rather than a medical one, that would not necessarily have permitted the retaliatory exercise of force that Plaintiff alleges he endured.

The Supreme Court has clarified that it is unnecessary for an inmate to prove that he suffered from any significant injury requiring medical attention in order to support an Eighth Amendment claim involving cruel and unusual punishment, *see Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178 (2010). Certainly, the extent of injury is one factor to be considered in determining whether the assertion of force "'could plausibly have been thought necessary' in a particular situation." *Id., quoting Whitley v. Albers*, 475 U.S. 312, 321 (1986). "That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995 (1992). Thus, the Eighth Amendment's "prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins*, 130 S. Ct at 1178 (quoting *Hudson*, 503 U.S. at 9). At this juncture, however, it remains unclear whether the force exercised by the Defendants was "*de minimis*." *See also Williams v. Curtin*, 631 F.3d 380 (6th Cir. 2011). The allegations in the complaint combined with the evidence submitted by Plaintiff is sufficient to create a material issue of fact; therefore, Defendants cannot be granted summary judgment on Plaintiff's claim of retaliation and/or excessive use of force by Defendant Sexton. However, any claims regarding verbal threats of transfer or a change in security- to the extent that Plaintiff presents such generic

"harassment" claims- should be dismissed, as such allegations do not rise to the level of a constitutional violation. See *Emmons v. McLaughlin*, 874 F.2d 351, 353-354 (6th Cir. 1989).

### 5. Qualified Immunity

As their last argument in favor of judgment in their favor, Defendants assert that they are entitled to summary judgment on all claims brought against them in their individual capacities based on the doctrine of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The purpose of qualified immunity is to provide governmental officials with the ability "reasonably to anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 646, 107 S. Ct. 3034, 3042 (1987) (internal quotation omitted). Thus, a governmental official performing discretionary functions will be entitled to qualified immunity unless his or her actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*,129 S.Ct. 808 (2009).

When a defendant moves for summary judgment based on qualified immunity, the official must first show that he/she acted within discretionary authority. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Once an official makes this showing, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established that any reasonable official in that position would have understood it was unreasonable to

engage in the conduct that violated the right.  *Id*.  In this case, Plaintiff has made no claim that Defendants were acting outside their authority, so the burden falls on Plaintiff to overcome the qualified immunity defense.

Plaintiff has failed to carry this burden as to the physician Defendants, because his complaints against those two Defendants fail to allege a violation of any constitutionally protected right.  By contrast, Defendant Sexton and the John Does Defendants (including Jennifer Young) are not entitled to qualified immunity on the retaliation or assault claims, because, based on the facts alleged, a reasonable correctional officer would have understood that he or she cannot inflict physical punishment upon an inmate based upon his exercise of his First Amendment rights.

### C.  Two Alternative Grounds Raised *Sua Sponte* by the Court

### 1.  Failure of Service Issue

With the exception of Correctional Officer Jennifer Young, Plaintiff has never identified any of the John Doe Defendants, and none have ever been served.   (Doc. 98).  The alleged liability of Officer Young and the John Doe Defendants rests upon the May 15, 2009 incident.

Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, a defendant must be served within 120 days after the complaint is filed, absent which the court "on motion or on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  Only if the plaintiff shows "good cause" for the failure of timely service may the court extend the time period for "an appropriate period."

Plaintiff did not assert his retaliation and assault claims against Defendant Sexton and the John Doe Defendants until he filed a second amended complaint on March 25, 2010. (Doc. 42). Plaintiff did not move to identify Jennifer Young until November 5, 2011, seven and a half months after filing his second amended complaint. (Doc. 126). Although Plaintiff's unopposed motion to amend was granted by this Court without discussion of the time limits for service,[11] Plaintiff's continued failure to identify any other "John Doe" Defendant warrants dismissal at this time of all remaining claims against the unknown Defendants.

At the same time, the Court will grant Plaintiff a very brief period of additional time in which to serve Correctional Officer Young. Plaintiff proceeds *in forma pauperis* and therefore is entitled to free service of process by the United States Marshal, so long as he provides the information required to effect service. Although Plaintiff was previously advised of his duty to provide instructions for service as to other named defendants (Doc. 46), the Court's January 2011 order granting Plaintiff's unopposed motion to amend to identify Officer Young failed to include the Court's customary instructions given to *pro se* litigants on the forms Plaintiff was required to complete to effect service. (Doc. 139). In addition, the order granting Plaintiff's motion neglected to direct Plaintiff or the Clerk to docket the tendered third amended complaint separately in the record. These administrative omissions of the Court have been corrected by separate order. However, if service is not promptly accomplished and if Plaintiff fails to provide alternate instructions for service of Defendant Young as stated in that order, that Defendant also should be

---

[11] A litigant's *pro se* status does not excuse him or her from compliance with the Federal Rules of Civil Procedure.

dismissed.

## 2. No Evidence of Custom or Policy

To the extent that Plaintiff has brought suit against Defendant Sexton or any other Defendant in his or her official capacity, Plaintiff's claims fail as a matter of law. Plaintiff's official capacity claims against the WCI employees are essentially claims against Warren County. *See Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). Warren County may be liable under § 1983 if it, through its officials, implemented a policy or custom that violated plaintiff's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694) (To subject a municipality to § 1983 liability for the actions of its employees, a plaintiff "must show that the alleged federal right violation occurred because of a municipal policy or custom."). The unlawful policy or custom must be the moving force behind the constitutional violation. *Monell,* 436 U.S. at 694; *Rizzo v. Goode*, 423 U.S. 362, 375 (1976). Here, Plaintiff has presented no evidence whatsoever demonstrating the existence of an official policy or custom involving the denial of appropriate medical treatment or physical abuse of inmates in retaliation for grievances. Therefore, summary judgment should be granted for all Defendants to the extent that they are sued in their "official" capacities.

## III. Conclusion and Recommendations

Accordingly, **IT IS RECOMMENDED THAT**:

1. Defendants' motion for summary judgment (Doc. 167) be **GRANTED IN PART** and **DENIED IN PART** for the reasons stated herein:

2.  Defendants Coulter and Woods are entitled to judgment as a matter of law on all claims stated against them, whether in their individual or official capacities;

3.  Plaintiff's claims against the Warden of WCI, to the extent that such claims still exist in this litigation (*see* Docs. 140, 182), also should be dismissed;

4.  Defendant Sexton is not entitled to judgment in his individual capacity on Plaintiff's First Amendment claim of retaliation or on Plaintiff's Eighth Amendment claim of excessive use of force, because Plaintiff adequately exhausted those claims administratively as required under the PLRA, and Defendant Sexton is not entitled to qualified immunity on those claims;

5.  Claims against all John Doe Defendants should be dismissed for failure of service, except that Defendant Correctional Officer Jennifer Young in her individual capacity should be substituted for John Doe No. 1 as previously provided for in the Court's Order of January 10, 2011.  (*See* Doc. 139).  Plaintiff's claims against Defendant Young in her individual capacity should remain pending at this time;

6.  Claims against Defendant Sexton and any other Defendant in his or her official capacity should be dismissed.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MUMIN ISRAFIL,                                    Case No. 1:09-cv-468

        Plaintiff,                              Spiegel, J.

                                         Bowman, M.J.

    v.

BARBARA WOODS, et al.,

        Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).